CORRECTED

# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1859V

| | |
|---|---|
| MARIA CRISTINA NARGI, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Filed: October 11, 2024 |
| Respondent. | |

*Matthew F. Belanger*, Faraci Lange LLP, Rochester, NY, for Petitioner.

*Lynn C. Schlie*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT[1]

On December 9, 2019, Maria Cristina Nargi filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine she received on January 5, 2017, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner has proven that she has suffered a SIRVA as set forth in the Table, and is therefore entitled compensation for her injury.

## I. Procedural History

After the case's initiation and records filing, an initial status conference was held on May 4, 2020, after which Petitioner was directed to file updated medical records, which she did on June 3, 2020, and June 16, 2020. (ECF Nos. 16, 19). Petitioner was further ordered to file additional records on August 25, 2020, and filed those records on November 16, 2020. (ECF No. 27).

On May 17, 2021, Respondent filed his Rule 4(c) Report contesting entitlement based on four arguments: 1) that the medical records do not establish that Petitioner's shoulder pain began within 48 hours; 2) that Petitioner did not have any demonstrated loss of range of motion ("ROM"); 3) that Petitioner's records leave a factual question as to in which arm she received the vaccination; and 4) that Petitioner's neurological symptoms suggest an alternative condition or abnormality that might explain her shoulder issues. Report at 8. (ECF No. 33).

In response, Petitioner updated medical records on September 7, 2022 (ECF No. 36) and the instant Motion for a Ruling on the Record on August 4, 2023, arguing that she had met the severity requirement and otherwise established entitlement to compensation for a SIRVA Table Injury. Petitioner's Motion for Ruling on the Record and Brief in Support of Damages ("Mot.") (ECF No. 42).

Respondent opposed the motion on September 11, 2023, reiterating the arguments set forth in the Rule 4(c) Report that Petitioner had failed to meet the requirements to establish either a Table SIRVA or off-Table SIRVA. Respondent's Response to Petitioner's Motion for Ruling on the Record ("Resp.") (ECF No. 43). Petitioner filed her reply on September 27, 2023. Petitioner's Reply Brief in Support of Petitioner's Motion for Ruling on the Record ("Reply") (ECF No. 44). The matter is ripe for resolution.

## II. Relevant Medical History

### 1. Medical Records

Ms. Nargi was 57 years old when she received the flu vaccine at Highland Medical on January 5, 2017. Ex. 3 at 1-3. Prior to her vaccination, Ms. Nargi had a history of dizziness, hyperlipidemia, Meniere's disease, and a bursa cyst in her right shoulder – but

2

she did not have any prior history of right shoulder pain. Ex. 3 at 28-48. As will be discussed in greater detail *infra*, there is a minor factual dispute as to the shoulder in which Ms. Nargi received the vaccine at issue.

On February 28, 2017 (54 days after receiving the flu vaccination), Ms. Nargi visited Dr. Jordan Simon at Northeast Orthopedics and Sports Medicine complaining of right pain in her shoulder "for the past eight weeks." Ex. 5 at 3. She noted at this time that she started experiencing right shoulder pain approximately two days after she received the flu vaccine. *Id.* An exam showed localized pain at the right shoulder. *Id.* at 4. Petitioner also underwent an x-ray on that day. *Id.* at 5.

On March 12, 2018, Ms. Nargi underwent an MRI on her right shoulder which revealed AC joint hypertrophy, infraspinatus tendinopathy and fraying with 2 mm cyst in the humeral head and no fracture. Ex. 4 at 1.

On April 4, 2017, Ms. Nargi returned to Dr. Simon with a chief complaint of right shoulder discomfort. Ex. 5 at 6. Dr. Simon's notes from that visit show full range of motion ("ROM") in the right shoulder with mildly positive impingement signs, no tenderness over the biceps, no significant rotator cuff pathology, and only mild degenerative changes at the AC joint. *Id.* Dr. Simon referred Ms. Nargi to physical therapy ("PT") for her right shoulder pain. *Id.*

Ms. Nargi began PT on April 26, 2017. Ex. 7 at 1. She noted that her pain began after she received the flu vaccine, although the record lists the date of pain onset as January 1, 2017 (thus pre-vaccination). *Id.* Between April 26, 2017, and August 29, 2017, Ms. Nargi attended 15 PT sessions. In her final session, it was noted that her strength and ROM had improved but that pain remained a limiting factor. *Id.* at 59.

Ms. Nargi returned to Dr. Simon on September 12, 2017, for treatment of pain in her right shoulder. Ex. 5 at 19. She reported that PT had helped her flexibility in the shoulder, but her pain remained. *Id.* An examination documented full ROM in her right shoulder, moderately positive impingement signs, and no tenderness over the biceps tendon. *Id.* Ms. Nargi was offered a subacromial steroid injection at this time to manage her symptoms, which she declined. *Id.* Ms. Nargi returned to Highland Medical for a preventative exam almost four months later, on January 10, 2018. Ex. 8 at 32. She reported she was seeing Dr. Simon for right arm pain "since previous flu injection." *Id.* she reported improvement in ROM after attended PT but was still experiencing pain and that she wanted to continue with PT. *Id.*

3

On January 26, 2018, Ms. Nargi saw Dr. Richard Semble at Northeast Orthopedics and Sports Medicine for her right shoulder pain. Ex. 5, at 21. An examination noted right shoulder tenderness on palpation of the deltoid muscle, with active motion normal. *Id.* at 22. Dr. Semble's assessment was rotator cuff tendinitis and bursitis and he referred Ms. Nargi for PT. *Id.* Ms. Nargi began PT at ROCORE Physical Therapy on March 23, 2018. Ex. 6 at 1. At that time, she rated her pain at 4/10. *Id.* This is the only PT session she attended at ROCORE Physical Therapy.

Ms. Nargi returned to Dr. Semble on July 13, 2018. Ex. 5 at 23. She reported she was doing well unless she used her right shoulder too much and aggravated her shoulder pain. *Id.* An examination showed right shoulder tenderness on palpation of the subacromial bursa and deltoid muscle. *Id.* at 24. Ms. Nargi was referred for additional PT but declined a trigger point injection to the right deltoid. *Id.* Ms. Nargi attended six PT sessions at ROCORE Physical Therapy between July 19, 2018, and October 31, 2018. Ex. 6 at 2-9.

Ms. Nargi had another preventative exam at Highland Medical on January 23, 2019. Ex. 8 at 19. There is no record of her mentioning right shoulder pain at that visit. *Id.* She also returned to Highland Medical on May 22, 2019, with a chief complaint of a cough, but no mention of right shoulder pain. *Id.* at 13-15.

On June 12, 2019, Ms. Nargi was seen at the Highland Medical emergency room ("ER") for pain in her right shoulder to her right elbow, redness, and swelling of her arm. Ex. 8 at 7. She was assessed as having cellulitis of her right arm and bursitis of her elbow, and tests confirmed that her c-reactive protein was high. *Id.* at 12. During this visit she was given Keflex and Motrin. Ms. Nargi went to the ER at Nyack hospital on June 17, 2019, complaining of a right arm infection. Ex. 9 at 5. She saw Dr. Benjamin Bradley, who noted a small amount of advancing erythema and prescribed her Keflex and advised her to follow up in two days. *Id.* The records do not indicate whether Ms. Nargi ever followed-up with Dr. Bradley.

On November 6, 2019, Ms. Nargi returned to Highland Medical with complaints of right arm pain, right leg pain, and a cough. Ex. 8 at 2. She was assessed as having an upper respiratory infection, acute bronchospasm, and neuropathy, and she was referred to a neurologist for a follow-up. *Id.* at 4.

On November 25, 2019, Ms. Nargi saw Dr. Marc London, a neurologist at Highland Medical. She reported that she had been experiencing right shoulder pain since a flu vaccination in January of 2017. Ex. 8 at 54. She reported this pain had been getting worse, radiating down her shoulder to her elbow with tingling and numbness. *Id.* Dr.

4

London suspected a possible brachial plexus disorder and noted that "the etiology of her symptoms is uncertain. I would have suspected a musculoskeletal etiology, but the MRI was reportedly normal. Possible thoracic outlet syndrome. I will have her return for electrodiagnostic testing." *Id.* at 56. Ms. Nargi never scheduled this testing.

On February 19, 2020, Ms. Nargi saw Ellen Mary Brunetti, a nurse at her PCP complaining of worsening right arm pain with a reported onset of "4 years ago." Ex. 15, at 39. Ms. Nargi complained of right shoulder pain, right arm pain, tingling, weakness, and electric shocks in her arm. *Id.* She noted she had seen a neurologist who suspected nerve damages, but that she did not follow-up with further testing. On review, Nurse Brunetti noted neurologic symptoms of extremity weakness, tingling, electric shocks, numbness, and pain – her assessment was brachial plexus disorder. Petitioner declined a neurologic evaluation but was referred to acupuncture, which she never attended. *Id.* at 41-42.

Ms. Nargi returned to Nurse Brunetti on July 24, 2020. She did not complain of any right arm pain but reported back pain, joint pain, joint swelling, and decreased arm ROM. Ex. 15 at 29-33. She returned to Nurse Brunetti on October 6, 2021 – again, no right arm pain was noted but there was mention of back pain, joint pain and swelling, muscle weakness, and neck pain. *Id.* at 21-22.

Ms. Nargi saw Nurse Brunetti again on February 9, 2022, after a slip and fall on ice. Her primary complaint that day was pain in her left shoulder, hip, ribs, and back along with a mild headache, left side neck pain, and decreased neck ROM. Ex. 15 at 12. At this time, Ms. Nargi also reported right arm pain which she described as experiencing since a flu shot in January of 2017. *Id.* Ms. Nargi was prescribed Mobic and Tylenol as needed for her pain plus Cyclobenzaprine for her muscle spasms. *Id.* Nurse Brunetti also recommended that Ms. Nargi follow-up with an orthopedist for further evaluation and referred petitioner to orthopedic surgery for both her left and right shoulders. *Id.* To date, Ms. Nargi has not had any surgery on either of her shoulders.

Ms. Nargi last saw Nurse Brunetti on April 20, 2022, for a routine exam. The records do not reflect any complaints of right shoulder pain at this exam. Ex. 15 at 4-7.

**2. Affidavit Evidence**

Ms. Nargi submitted two affidavits in support of her claim. In the first, dated December 9, 2019, Ms. Nargi states that she felt pain in her right shoulder "right after the January 4, 2017, injection, but initially I did not think anything of it. However, over the course of the night my right shoulder pain got worse and by the next morning, I was having trouble lifting my right arm." Ex. 1 ¶ 5. She goes on to state that she "assumed that my

5

pain would go away over time and really did not consider that a flu shot could cause a permanent injury" and that she called her primary care physician "a few weeks after the shot and she reassured me that the pain would go away." *Id.* ¶ 6.

She further states that after the pain did not go away, she "went back to my primary care physician, who referred me to Northeast Orthopedics and Sports Medicine" and was given an appointment on February 28, 2017. *Id.* ¶ 7. Concerning that appointment with Dr. Simon, Ms. Nargi indicates that the records from that visit are not accurate because although the records state she felt pain in her shoulder two days after vaccination, she instead "had pain at the time of the flu shot that got worse by the next morning such that I couldn't lift my arm." *Id.* ¶ 8.

Ultimately, Ms. Nargi maintained that when she started PT, she had difficulty reaching overhead, behind her back, or away from her body, that it was difficult for her to carry groceries and laundry, and that her pain made it difficult to sleep at night, that the PT gave her some improvement in motion but still had pain that limited her ability to perform basic activities, and that despite the medical treatment and PT, she continues to have pain, weakness, and limited ROM in her right shoulder with pain that wakes her up at night and difficulty reaching over her head or behind her back. *Id.* ¶¶ 10-13.

Ms. Nargi's second affidavit speaks to some recommended treatment she never obtained. Regarding potential acupuncture treatment, Ms. Nargi states that she was given a referral but was unable to make contact with the facility and eventually stopped trying to contact them. Ex. 14 ¶ 3. Regarding a nerve conduction test, Ms. Nargi indicates that she looked into the details of the test, learned that it was very painful, and decided not to undergo that test with no plans to do so in the future. *Id.* ¶ 4.

### III. Parties' Respective Arguments

Petitioner argues that the submitted medical records and affidavits clearly demonstrate that she suffered a SIRVA injury following receipt of the flu vaccine on January 5, 2017. Mot. at 1. Respondent argued that Petitioner's claim fails because 1) the medical records do not establish that Petitioner's shoulder pain began within 48 hours; 2) Petitioner did not have any demonstrated ROM loss; 3) Petitioner's records leave a factual question as to in which arm she received the vaccination; and 4) Petitioner's neurological symptoms suggest an alternative condition or abnormality that might explain her shoulder issues. Report at 8. Respondent also argued that Petitioner has not established a cause-in-fact claim. *Id.* at 15-16.

## IV. <u>Applicable Law</u>

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined.

7

*Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V.     Analysis

### I.     Fact Findings – Onset and Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

8

vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42

Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A.  Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

#### 1.  Petitioner has no Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Ms. Nargi's medical history does not evidence pre-vaccination explanatory "pain, inflammation or dysfunction," and Respondent does not contend that it does. Although the records do reflect Ms. Nargi has a cyst on her right shoulder, the record does not support the conclusion that the cyst has caused Ms. Nargi any pain, either before or after her vaccination. Therefore, the first SIRVA criterion is met.

### 2. Pain Occurs with the Specified Timeframe (Onset)

In order to meet the definition of a Table SIRVA, a petitioner must show that she experienced pain within 48 hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B) and § 100.3(c)(10)(ii) (QAI criteria)).

Respondent's argument rests on the fact that Ms. Nargi did not *report* her shoulder injury to a medical provider until almost two months after vaccination, and that when so reporting, many of the records do not reflect an account of pain occurring within 48 hours after vaccination, but instead that she experienced pain sometime after receiving the flu vaccine. Response at 10. Respondent also notes various medical visits, both routine in nature and for other specific events, in which Ms. Nargi had the opportunity to mention her right shoulder pain but did not. *Id.*

In her affidavit, Ms. Nargi explains the reasons for her delay in seeking treatment. She states that after "a couple" of weeks of shoulder pain, she called her PCP and was reassured that the pain would eventually subside. Ex. 1 ¶ 6. When it did not, Ms. Nargi states she again called her PCP, who referred her to Northeast Orthopedics and Sports Medicine, where she had been previously for a wrist injury in 2015. *Id.* ¶ 7. This affidavit also describes the onset of her injury, noting that "over the course of the night my right shoulder pain got worse and by the next morning, I was having trouble lifting my right arm." *Id.* ¶ 5. Additionally, she disputes Dr. Simon's recording of her shoulder symptoms from her February 28, 2017, visit in which Dr. Simon indicates that shoulder pain started two days after vaccination – she states that she told him she had pain from the time she got her vaccination which worsened overnight such that she had difficulty lifting her right arm the next morning. *Id.* ¶ 8.,

There is no dispute that Ms. Nargi waited almost two months before being seen for her left shoulder symptoms. Although this is not a trivial amount of time to delay treatment, there are a variety of reasons that an individual may so act - especially for a SIRVA. Many individuals expect, and are advised, that there will be pain at the injection site after vaccination. This can lead to them putting off treatment. An individual's particular threshold for pain or avoidance of doctors are other reasons. In this case, Ms. Nargi has started that she called her PCP about her shoulder pain but was advised it would resolve on its own.

I also note other record support for onset. In addition to filing medical records which indicate Ms. Nargi reported her pain started within 48-hours of vaccination (*See* Ex. 7 generally), there are no records which would otherwise undercut that conclusion. Even accepting as true Dr. Simon's records that she experienced shoulder pain "two days" after

vaccination, that representation is also somewhat consistent with a 48-hour onset. Ms. Nargi received the flu vaccination at approximately 10:08 AM on January 5, 2017. Ex. 2 at 1. Even if she woke up the morning of January 7, 2017, with pain and reduced ROM, the onset requirement would still be satisfied. None of the records place the onset of her symptoms as at any time other than after her vaccination.

Therefore, I find that the totality of the evidence preponderantly supports the conclusion that Ms. Nargi's shoulder pain occurred within 48 hours of her vaccination.

### 3. Petitioner Experienced Pain and Loss of Range of Motion in her Right Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)). Respondent argues that Petitioner has not shown she suffered reduced ROM because "the first time petitioner reported any limited ROM was at PT on April 26, 2017, over four months after vaccination." Response at 11. Respondent further notes that when Dr. Simon conducted a physical exam of her, he found that she had full ROM in her right shoulder along with forward flexion and external rotation numbers which where identical to those in her left, presumably uninjured shoulder. *Id.*

It is true that when Ms. Nargi saw Dr. Simon on April 6, 2017, the records from that visit reflect that Dr. Simon found the "[r]ight shoulder shows full range of motion" upon physical examination. Ex. 5 at 7. However, the records for PT, which Ms. Nargi began later that same month, clearly reflect that the physical testing performed then showed that Ms. Nargi had reduced ROM in her right shoulder. For example, her Shoulder Flexion AROM was measured at 100 degrees, her Shoulder Flexion PROM was measured at 105 degrees, and it was noted she was unable to reach the top of her head or reach back towards her opposite shoulder. Ex. 7 at 2. In outlining her goals, the records reflect that her goal number for these shoulder flexions was 180 degrees. *Id.* at 3.

Furthermore, the records from the 15 PT sessions Ms. Nargi attended between April 26, 2017, and August 29, 2017, all reflect that her ROM testing numbers gradually increased, which is consistent with Ms. Nargi's assertion that the PT helped increase her ROM but did not help resolve her shoulder pain. *See generally* Ex. 7. These detailed PT records are enough to establish preponderant evidence that Ms. Nargi suffered loss of ROM in her right shoulder in addition to pain, even if the ROM was not present at all times.

It is also worth mentioning that to the extent Respondent attempts to argue that Ms. Nargi failed to show reduced ROM because "the first time she reported any limited

ROM was at PT on April 26, 2017, over four months after vaccination", that argument has no moment. I have previously ruled that ROM loss need not be shown to have *begun* within 48-hours of vaccination (as with pain). Rather, there must be evidence of *some* post-vaccination record of ROM limitations - and the ROM requirement is specific to actual, demonstrated movement limitations. *McNally v. Sec'y of Health & Hum. Servs.*, No., 2024 WL 4024429, at *4 (Fed. Cl. Spec. Mstr. Jul. 31, 2024). Thus, even if Ms. Nargi's ROM issues began four months after vaccination, she would still satisfy the QAI requirements for demonstrated loss of ROM.

Therefore, because the evidence preponderates in favor of a finding of loss of ROM in her right shoulder, and there is no serious contention that Ms. Nargi did not suffer pain in her right shoulder, I find that she has satisfied this requirement in proving a Table SIRVA.

### 4. Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent argues that because Ms. Nargi has exhibited right shoulder and arm symptoms which her treating physicians classified as neurological in nature, she has not established that there are no other conditions or abnormalities which would explain her current symptoms. Response at 13. Respondent specifically points to visits with Dr. London on November 25, 2019, and Nurse Brunetti on February 19, 2020, where both suspect a possible brachial plexus disorder as the cause of her pain, tingling, and numbness she was experiencing in her right arm. *Id.*

While it appears the case that Ms. Nargi suffered some sort of neurological event in November 2020 which caused her symptoms of numbness and tingling in her right arm, this does not erase her past history in which she had been suffering from right shoulder pain *for almost three years prior to the arrival of these new symptoms*. It is thus possible that Ms. Nargi suffered from simultaneous conditions, related and unrelated to her vaccination. Between January of 2017 when she received the flu shot and November 2020 when she first reported neurological symptoms, the records reflect pain, loss of ROM, bursitis, tendonitis, and other symptoms consistent with SIRVA, but no mention of numbness or tingling.

As I have previously ruled, the mere presence of neurological symptoms alongside SIRVA symptoms does establish a potential neurological condition as evidence of another condition or abnormality explaining the apparent SIRVA. *See Begay v. Sec'y of Health & Hum. Servs.*, No. 20-494V, 2021 WL 4165028, at *5 (Fed. Cl. Spec. Mstr. Aug. 12, 2021). That is especially true when, as here, Petitioner exclusively demonstrated symptoms

expected in a potential SIRVA for almost three years before exhibiting any symptoms of a neurologic nature. Such symptoms likely speak to a distinguishable neurologic injury separate from any SIRVA she experienced years earlier. Such neurologic symptoms, however, are relevant to damages, since not all of Ms. Nargi's post-vaccination damages would be compensable.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Despite Respondent's argument the record leaves a factual question regarding the arm in which she received the vaccination, the overall record contains sufficient preponderant evidence to fulfill these additional requirements.

Specifically, Respondent contends that "petitioner's conflicting vaccine administration documentation leaves a factual question regarding the arm in which she received the vaccination" and that due to this factual issue, "petitioner has not preponderantly demonstrated that her symptoms were limited to the shoulder in which she received the flu vaccination." Response at 12. Indeed, Ms. Nargi has submitted two immunization forms into the record: the first (Ex. 10) indicating the injection site was the left deltoid; the second (Ex. 11) indicates the injection site as the right deltoid. The remainder of the information in these records is identical, including the date and time the flu vaccination was administered and the lot number of the vaccination.

Petitioner argues that the reference to the injection site as the left deltoid is a clerical error that stands in contrast to the rest of the contemporaneous treatment records, in which Ms. Nargi alleged she received her flu vaccination in her right arm and received treatment for pain and loss of ROM in her right arm. Motion at 8. Petitioner also attempts to buttress her argument by including a brief letter from Nurse Brunetti. In it, Nurse Brunetti states that Ms. Nargi was given the flu vaccine by an MA, and that she believes reference to the left deltoid "was a mistake on the part of the MA because all of my records and notes written by me in follow up appointments indicate that it was her right arm." Ex. 12 at 1.

Based on the record as it stands, I find there is preponderant evidence to support the assertion that Ms. Nargi received the flu vaccination in her right arm. That there are two medical records that are essentially identical in all respects except for injection site speaks to a likely clerical error on the part of a records creator. There is no reason to suspect Ms. Nargi received two identical vaccinations, one in each arm, on January 4, 2017. Thus, one must have been created or recorded in error. The fact that all other

14

records reflect symptoms and treatment related to her right arm is preponderant evidence that Ms. Nargi did receive the flu vaccination in her right arm. *See Stoliker v. Sec'y of Health & Hum. Servs.*, No. 17-990V, 2018 WL 6718629 (Fed. Cl. Spec. Mstr. Nov. 9, 2018) (Court finding a petitioner's contemporaneous treatment records were strong corroborating evidence of proof of injection site); *Parker v. Sec'y of Health & Hum. Servs.*, No. 15-1331V, 2016 WL 3443929 (Fed. Cl. Spec. Mstr. May 13, 2016) (same).

Therefore, the record shows that Ms. Nargi received a flu vaccine intramuscularly in her right shoulder on January 4, 2017. *See* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's left shoulder pain occurred within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to her right shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id.* Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from January 7, 2016 (48 hours after vaccination), the records undoubtedly demonstrate that Ms. Nargi suffered the residual effects of her shoulder injury for more than six months, and there is no argument otherwise from Respondent.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## II.     Conclusion

**In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will follow this ruling directing the parties as to the next steps in this matter.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master